1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
SEATTLE DIVISION

10

MARTIN TUTSCHEK, Derivatively on
Behalf of COCRYSTAL PHARMA, INC.,

No. 19-01775

11

Plaintiff,

12

v.

13

RAYMOND F. SCHINAZI, GARY WILCOX,
PHILLIP FROST, JANE HSIAO, STEVE
RUBIN, DAVID S. BLOCK, ELLIOT
MITCHELL MAZA, JEFFREY MECKLER,
BRIAN KELLER, TODD BRADY, BARRY
HONIG, MICHAEL BRAUSER, JOHN
STETSON, and JOHN O'ROURKE,

VERIFIED STOCKHOLDER
DERIVATIVE COMPLAINT

14
15

JURY TRIAL DEMANDED

16
17

Defendants,

18

and

19

COCRYSTAL PHARMA, INC.,

20
21

Nominal Defendant.

22
23
24
25
26
27
28

Plaintiff Martin Tutschek, through his undersigned attorneys, brings this derivative action on

behalf of Nominal Defendant Cocrystal Pharma, Inc. ("Cocrystal" or the "Company") against

Cocrystal's current and former officers and directors, and against Barry Honig ("Honig"), Michael

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT 1

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

Brauser ("Brauser"), John Stetson ("Stetson"), and John O'Rourke ("O'Rourke") (collectively, the "Honig Group"), controlling stockholders of Cocrystal. Plaintiff alleges the following upon personal knowledge with respect to himself and his own acts, and as to all other matters upon information and belief, based upon the substantial investigation of his counsel, including, among other things, an analysis of: (i) the Company's filings with the United States Securities and Exchange Commission ("SEC"); (ii) an action brought by the SEC against Phillip Frost ("Frost"), OPKO Health, Inc. ("OPKO"), a publicly traded healthcare company purportedly involved in the discovery, development and commercialization of proprietary pharmaceutical products, medical devices, vaccines, diagnostic technologies and imaging systems, Frost Gamma Investments Trust ("FGIT"), which is controlled by Frost and shares its principal place of business with OPKO, Southern Biotech, Inc. ("Southern Biotech"), as well as Honig, O'Rourke, and Brauser, for engaging in three illegal pump-and-dump schemes (the "SEC Action" or "SEC Complaint"), in litigation captioned *SEC v. Honig, et al.*, No. 18-8175 (S.D.N.Y.) (First Amended Complaint filed March 8, 2019); (iii) a securities class action brought in the United States District Court of New Jersey captioned *Pepe v. Cocrystal Pharma, Inc. F/K/A/ BioZone Pharmaceuticals, Inc.*, No. 2:18-CV-14091 (Complaint filed September 20, 2018), brought on behalf of purchasers of Cocrystal stock between September 23, 2013 and September 7, 2018; and (v) an action brought in the Superior Court of California, County of San Diego, captioned *MabVax Therapeutics Holdings, Inc. v. Honig, et al.*, Case No. 37-2019-00018398 (complaint filed April 8, 2019), alleging claims for unlawful market manipulation, unlawful business practices, fraud, breach of fiduciary duties, and other claims associated with misconduct regarding MabVax Therapeutics Holdings, Inc. ("MabVax").

## NATURE OF ACTION

1.  Cocrystal's current and former directors and officers (the "Cocrystal Defendants") have breached their fiduciary duties of loyalty, good faith, due care, and candor to the Company and its shareholders by colluding from at least September 2013 through March 2019 (the "relevant period") to benefit themselves to the detriment of the Company through a protracted and complex web of transactions encompassing numerous violations of the federal securities laws.

2.  Cocrystal was originally a privately-held company named BioZone Laboratories, Inc. ("BioZone Labs").  Later, it was incorporated in Nevada under the name BioZone Pharmaceuticals, Inc. ("BioZone"), and finally reincorporated in Delaware as Cocrystal, after undergoing a reverse merger with Cocrystal Discovery, Inc. ("Cocrystal Discovery"), a shell corporation managed by Defendant Honig, as part and parcel of a "pump-and-dump" scheme.

3.  The original BioZone Labs attracted the attention of Defendant Frost, who, as Chief Executive Officer ("CEO") of OPKO and an investor in several drug therapy companies, had a seemingly strong interest in BioZone Labs' products.

4.  Defendant Frost, together with Honig and Brauser, convinced the co-founders of BioZone Labs, Defendant Brian Keller ("Keller") and non-party Daniel Fisher ("Fisher"), to take BioZone Labs public as a means to generate increased capital to further the company's research and development efforts.  To incentivize Fisher and Defendant Keller, they were promised between $8 and $15 million in investment capital, along with equity stakes in the new company, and a guarantee of continued employment.  However, after BioZone Labs was taken public through the reverse merger, the business was placed under the control of Defendant Elliot Mitchell Maza ("Maza"), a close business associate of Honig.

5.  BioZone Labs was renamed BioZone, and, soon after, Defendants Frost, Honig, and Brauser, in concert with Defendants Maza and Keller, orchestrated a plan to artificially inflate

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

BioZone's stock price and sell their accumulated shares at a significant profit. With the assistance of O'Rourke and a stock promoter, John Ford ("Ford"), Defendant Frost and his associates successfully manipulated BioZone's stock price by arranging undisclosed stock promotions and deceptively increasing the trading volume of BioZone's stock. As a result, BioZone's stock price more than doubled, despite the lack of improvement in the Company's fundamentals.  To the contrary, by virtue of BioZone's default on a bank credit line connected with the reverse merger, as more fully addressed below, the Company was laden with additional debt and its equity was further diluted as part of the refinancing adopted to bail out of the default, further deteriorating the financial and operational prospects of the company.

6.     After Frost and his associates reaped large profits by selling their shares at artificially inflated prices, they carried out the reverse merger through which BioZone became Cocrystal. The merger was then executed by combining BioZone with Cocrystal Discovery, with which Frost was closely affiliated.

7.     As a result of the foregoing, Cocrystal must now expend millions of dollars to defend itself in a pending securities class action lawsuit.  This damage is compounded by the Company's prior payment of millions of dollars to Maza and Keller who were unjustly enriched while engaging in the pump-and-dump scheme and/or the concealment of that scheme.

8.     The Defendants breached their fiduciary duties by engaging in the misconduct alleged herein. As a direct and proximate result of those breaches of fiduciary duties, Cocrystal has sustained material damages. Plaintiff has brought this action derivatively on behalf of Cocrystal to recover those damages.  Plaintiff made no demand upon the Cocrystal Board of Directors prior to initiating this lawsuit since it would have been a useless and futile act.  The Cocrystal Board faces a substantial likelihood of liability for their breaches of fiduciary duties and other misconduct and as such lacks the required disinterest and independence to fairly consider such a demand.

**VENUE AND JURISDICTION**

9.      The Court has jurisdiction over the causes of action asserted under Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 14a-9 promulgated thereunder by the SEC, pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.  Supplemental Jurisdiction over the remaining claims exists pursuant to 28 U.S.C. § 1367.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

10.     This Court has jurisdiction over each Defendant named herein because each Defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

11.     Venue is proper in this Court in accordance with 28 U.S.C. § 1391(a) because: (i) Cocrystal maintains its principal place of business in this District; (ii) one or more of the Defendants either resides in or maintains executive offices in the District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Cocrystal, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

**PARTIES**

12.     Plaintiff Martin Tutschek is a long term and current owner of Cocrystal common stock, owned Cocrystal common stock at the time of the transactions complained of, and has continuously owned such shares since 2013.

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

13.     Nominal Defendant Cocrystal is duly incorporated under the laws of the State of Delaware, with its principal place of business and executive offices at 19805 North Creek Parkway, Bothell, Washington.   Cocrystal's main business is the research, discovery and development of novel antiviral therapeutics targeting the replication machinery of the hepatitis, influenza, and noroviruses.   Its stock trades on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "COCP."

14.     Defendant Raymond F. Schinazi ("Schinazi") was a member of the Cocrystal Board of Directors (the "Board"), having served as Chairman from March 11, 2015 until February 1, 2019, and was a member of the Corporate Governance and Nominating Committee.   Schinazi is the Company's "principal shareholder," holding 10,361,985 shares of Cocrystal's common stock, or 32.6% of the Company's outstanding shares, as of April 24, 2019, inclusive of 995,593 shares of common stock held through an undisclosed entity he controls and 125,464 vested options.   He joined the Board after his company, RFS Pharma, LLC merged with Cocrystal in November 2014. He is also a director of Brace Pharma Capital, Inc. ("Brace Pharma").   He has been at Emory University since 1978 and currently serves as the Frances Winship Walters Professor of Pediatrics and Director of the Laboratory of Biochemical Pharmacology at Emory. During the relevant period, Cocrystal paid Schinazi the following compensation:

| Fiscal Year | Fees Earned or Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2015 | $58,000 | $340,802 | $398,802 |

15.     Defendant Gary Wilcox ("Wilcox") is the Chairman and Chief Executive Officer ("CEO") of Cocrystal.   He was the Vice Chairman of the Board from the time BioZone merged with Cocrystal Discovery (previously serving as Chairman and CEO of Cocrystal Discovery). Defendant Wilcox served as the Interim CEO of Cocrystal from July 2016 until February 2019.

He previously served as CEO from January 2014 until March 2015.   As of April 24, 2019,

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

Defendant Wilcox owns 564,952 shares of Cocrystal common stock, or 1.8%, and holds rights – expiring on September 20, 2028 – to an additional 200,000 shares through unexercised options with an exercise price of $2.78 per share.   According to the Company's 2018 Proxy Statement, Defendant Wilcox is not independent under NASDAQ listing rules.   During the relevant period, Cocrystal paid Wilcox the following compensation:

| Fiscal Year | Salary | Option Awards | Total |
|---|---|---|---|
| 2014 | $244,960 | | $244,960 |
| 2015 | $133,487 | | $133,487 |
| 2016 | $100,643 | | $100,643 |
| 2017 | $100,643 | | $100,643 |
| 2018 | $136,952 | $421,400 | $558,352 |

16.      Defendant Frost is a director of Cocrystal since January 2014, and is a member of its Audit Committee.   As of April 24, 2019, he owns 3,664,014 shares of the Company's common stock, or 11.6%, another 3,655,265, or 11.6%, through FGIT, and another 2,659,683 shares, or 11.6%, through OPKO, inclusive of 2,626,350 shares and 33,333 warrants.   Upon information and belief, he is the CEO and Chairman of OPKO, prior Chairman of the Board of Teva Pharmaceutical Industries, Limited ("Teva"), and before that IVAX Corporation ("IVAX").   On December 27, 2018, Frost consented to the entry of judgment against him in the SEC Action, entered by the Court on January 10, 2019, agreeing to pay $5.5 million in penalties to the SEC, disgorgement of profits, and payment of prejudgment interest.   Frost further agreed to a prohibition from buying new penny stocks, as well as restrictions on his sale of penny stocks.   During the relevant period, Cocrystal paid Frost the following compensation:

| Fiscal Year | Fees Earned or Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2015 | $27,500 | $340,802 | $368,302 |
| 2018 | | $105,350 | $105,350 |

17.      Defendant Jane Hsiao ("Hsiao") is a director of Cocrystal since January 2014, Chair of the Corporate Governance and Nominating

Committee, and a member of the Compensation Committee.  Upon information and belief, Hsiao has an extensive professional relationship with Frost, having worked alongside him as the Vice Chairman and Chief Technical Officer ("CTO") of OPKO and as Vice Chairman of IVAX from 1995 to January 2006, when IVAX was acquired by Teva.  During the relevant period, Cocrystal paid Hsiao the following compensation:

| Fiscal Year | Fees Earned or Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2015 | $35,500 | $340,802 | $376,302 |
| 2018 | | $105,350 | $105,350 |

As of April 24, 2019, Hsiao owns 306,479 shares of Cocrystal common stock, or 1.0%, inclusive of 183,221 shares held by Hsu Gamma Investment, L.P. ("HGI"), for which she serves as General Partner, 8,749 vested options, and 350,000 10-year Cocrystal stock options exercisable at $1.17 per share beginning in April 2016.

18.     Defendant Steve Rubin ("Rubin") is a director of Cocrystal since January 2014, Chairman of the Audit Committee and Compensation Committee, and a member of the Corporate Governance and Nominating Committee.  Rubin has a close professional relationship with Frost. He is the Executive Vice President ("EVP")-Administration and served as a director at OPKO since May 2007. He was formerly Senior Vice President and General Counsel of IVAX.  Rubin has also served as an advisor to MabVax, a company in which Frost heavily invested and a named defendant in the SEC Complaint. Rubin was also a director of ChromaDex, Inc. ("ChromaDex"), another company in which Frost's investment group heavily invested.  During the relevant period, Cocrystal paid Rubin the following compensation:

| Fiscal Year | Feed Earned or Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2015 | $38,000 | $340,802 | $378,802 |
| 2018 | | $105,350 | $105,350 |

Frost also received 350,000 10-year Cocrystal stock options exercisable at $1.17 per share beginning in April 2016.

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT 8

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

19.     Defendant David S. Block ("Block") served as a director of Cocrystal from November 2014 until January 4, 2019.  Block was a member of the Audit Committee and the Chairman of the Compensation Committee.  In 2015, he received compensation of $383,802.

20.     Defendant Maza was director, CEO, and Chief Financial Officer ("CFO") of BioZone from July 2011 through January 2014.  He is a licensed attorney and certified public accountant.  In March 2019, he consented to the entry of judgment against him in the SEC Action providing for his permanent bar from: (i) participating in or being a director or officer of any penny stock company; (ii) violating SEC Rule 10b-5; (iii) violating SEC Rule 15d-1; and (iv) violating Section 17(a) of the Securities Act of 1933, and allowing the SEC to order the further disgorgement of his ill-gotten gains.  Between 2011 and 2013, he was paid over $1.2 million in compensation and bonuses.

21.     Defendant Jeffrey Meckler ("Meckler") was a director and interim and then permanent CEO of Cocrystal from March 2015 until July 2016.  During the relevant period, Cocrystal paid Meckler the following compensation:

| Fiscal Year | Salary | Bonus | Option Awards | Total |
|---|---|---|---|---|
| 2015 | $214,504 | $140,325 | $9,016,542 | $9,371,371 |
| 2016 | $237,709 | | | $237,709 |

22.     Defendant Brian Keller ("Keller") is a co-founder of BioZone Labs.  Defendant Keller was the Chief Scientific Officer ("CSO") of BioZone Labs, a director and a stockholder of the Company from June 2011 through January 2014.  He is now the President of Sales and Senior Vice President of Research and Development at Cocrystal.  In 2011, 2012, and 2013, he received compensation of $135,712, $198,961, and $198,750, all in salary.  In March 2019, he consented to the entry of judgment against him in the SEC Action providing for his permanent bar from: (i) participating in or being a director or officer of any penny stock company; (ii) violating SEC Rule

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

10b-5; (iii) violating SEC Rule 15d-1; and (iv) violating Section 17(a) of the Securities Act of 1933, and allowing the SEC to order the further disgorgement of his ill-gotten gains.

23.     Defendant Todd Brady ("Brady") is a Director of Cocrystal since February 1, 2019, serving on the Company's Audit Committee, and is a director of Brace Pharma, a position he holds since April 2014.

24.     Defendant Honig is one of the controlling shareholders of Cocrystal.  As of September 2013, Honig personally owned approximately 5.5 million shares of Cocrystal stock, or almost 9% of the Company's outstanding shares, all of which were acquired through private investments in public equities ("PIPE") financing, and all of which was restricted stock pursuant to Securities Act Rule 144(a)(3)(i).  Between 2011 and 2018, Honig invested alongside Brauser, Stetson and O'Rourke, whether individually or through their controlled entities, in at least 19 issuers, one of which being Cocrystal.  In violation of the federal securities laws and in breach of his fiduciary duties, Honig sold almost six million shares of the Company's stock between September 23 and December 16, 2013, for proceeds of almost $3.5 million, without complying with Securities Act Rule 144(e), which precludes the sale of stock in excess of 1% of the Company's total outstanding shares in any quarter.  On June 17, 2019, Honig consented to the entry of judgment against him in the SEC Action providing for, among other things, his permanent bar from: (i) participating in an offering of any penny stock company, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of, or holding any beneficial ownership of shares of stock in excess of 4.99% of any penny stock; (ii) promoting, funding, or exercising control over any issuer of penny stock; (iii) violating SEC Rule 10b-5; (iv) violating Sections 5, 9(a)(2) and 13(d) of the Exchange Act; (v) violating Section 17(a) of the Securities Act of 1933; and (vi) allowing the SEC to order the further disgorgement of his ill-gotten gains and penalties thereon.

25.     Defendant Brauser is one of the controlling shareholders of Cocrystal.  Between 2011 and 2018, Brauser invested alongside Honig, Stetson and O'Rourke, whether individually or through their controlled entities, in at least 19 issuers, one of which being Cocrystal.  In violation of the federal securities laws and in breach of his fiduciary duties, Brauser and his affiliate sold more than 2.25 million shares of the Company's stock between September 27 and December 23, 2013, for proceeds of more than $1.25 million.

26.     Defendant Stetson is one of the controlling shareholders of Cocrystal.  Between 2011 and 2018, Stetson invested alongside Honig, Brauser and O'Rourke, whether individually or through their controlled entities, in at least 19 issuers, including Cocrystal.  Also, in August and September 2013, Stetson arranged for the deposit into a brokerage account of and the lifting of the restrictions over the restricted shares of Cocrystal stock issued to Honig, falsely representing to the brokerage firm that Honig was not affiliated in any way with Cocrystal, thereby allowing Honig to circumvent the volume sales restrictions otherwise applicable to affiliates under the federal securities laws.  In violation of the federal securities laws and in breach of his fiduciary duties, Stetson and his affiliate sold half a million shares of the Company's stock between September 27 and December 18, 2013, for proceeds of almost $280,000.

27.     Defendant O'Rourke is one of the controlling shareholders of Cocrystal.  Between 2011 and 2018, O'Rourke invested alongside Honig, Brauser and Stetson, whether individually or through their controlled entities, in at least 19 issuers, one of which being Cocrystal.  O'Rourke and his affiliated entity, in violation of the federal securities laws and in breach of his fiduciary duties, sold 250,000 shares of the Company's stock between October 4 and December 27, 2013, for an average price of $0.59 per share for proceeds of $148,443.68, after having purchased those shares on October 4, 2013, by exercising one of Honig's notes convertible into shares for $0.20 per share or $50,000.00, netting a profit of $98,443.68, a return of almost double the investment, excluding its

cost, within approximately two months from time of purchase.

28. The Defendants named in ¶¶14-23 are referred to herein as the "Cocrystal Defendants."

## SUBSTANTIVE ALLEGATIONS

### A. The "Pump and Dump" Scheme

29. BioZone Labs, then a private biotechnology company manufacturing over-the-counter pharmaceutical products, was founded by Defendant Keller and Fisher, who were developing for market a formulation using a patented technology called "Qusomes." However, BioZone Labs lacked funding to support the development of this Qusomes formulation.

30. In late 2010, Honig and Brauser approached Keller and Fisher about taking BioZone Labs public through a reverse merger into a publicly-traded shell company named International Surf Resorts, Inc. ("Surf"), which was controlled by Honig and Brauser through related entities and other individuals in the group. As an inducement, Honig and Brauser promised that as part of the deal, between $11 and $13 million of the proceeds from the public offering would be dedicated for research and development ("R&D") of the Qusomes technology formulation.

31. In late January and early February 2011, Honig, Brauser and Frost executed a binding letter of intent on behalf of Surf (which was to be renamed BioZone under the letter of intent) with BioZone Labs' Keller and Fisher committing to: (i) the reverse merger proposal; (ii) Keller and Fisher to be paid 6,650,000 shares each in the newly merged public company; (iii) BioZone Labs to draw down $2 million in bridge financing to pay for the reverse merger from an existing $3 million line of credit between BioZone Labs and Bank of Marin (the "Bank"); (iv) Keller's and Fisher's continued employment in the newly merged company; and (v) the re-payment of loans previously made to BioZone Labs by Keller. The binding letter of intent was subject to satisfactory completion of due diligence and other customary conditions to closing, which were

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT 12

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

expected to be completed by March 31, 2011.

32.     In March 2011, during the due diligence period contemplated by the letter of intent with Surf, the Bank objected to the reverse merger with Surf pursuant to the Bank's right to object to a major transaction under the terms of the BioZone Labs credit line with the Bank.  As the Bank noted, "[under] the proposed new transaction, persons who are not known to the Bank…would assume control of [BioZone Labs]…" and, as a second reason, the Bank stated: "The proposed acquisition creates enormous conflicts of interest. There is substantial reason to believe that the resulting entity would act for the benefit of [the Investors] as a whole, rather than the interests of [BioZone Labs]."  The Bank concluded its rejection of the Surf reverse merger by stating that if BioZone Labs were to proceed with the reverse merger despite the Bank's rejection, that would itself constitute a default under the credit line and the full amount owing thereunder would immediately become due and payable.

33.     Despite the Bank's objections, the merger of BioZone Labs and Surf closed in June 2011, BioZone Labs drew down the $2 million in bridge financing from the Bank contemplated by the letter of intent executed with Surf, and, as a result, BioZone was created.  Thereafter, the Bank sent BioZone a default notice regarding the line of credit.

34.     Virtually immediately after the Surf reverse merger creating BioZone was completed, Honig and Brauser installed Maza as BioZone's CFO and as a director and changed the Company's corporate address to the same business address as was shared by Honig, Brauser and Frost.

35.     On September 8, 2011, at the direction of Honig and Brauser, Maza authorized BioZone to pay off BioZone's credit line with the Bank, which was accomplished through additional PIPE financing supplied by the Honig Group.

36.     Consequently, Frost, Honig, and Brauser controlled the vast majority of BioZone's

stock and, thereby, controlled the management of BioZone.

37.     Further evidence of the control exerted by Frost, Honig, and Brauser over BioZone's management is manifested by several additional examples, among many others, orchestrated by them after the Surf reverse merger.  **First**, Maza was elevated from CFO to CEO of BioZone. **Second**, BioZone retained the same corporate counsel (firm and name partner) as Honig installed in other firms in which he invested.  **Third**, in complete derogation of his fiduciary duties to BioZone, Maza sought and received approval from Honig, Brauser and Frost for material business decisions regarding BioZone, including the approval to divert funds from BioZone to "pay rent for the office of an unrelated entity co-owned by Honig and Brauser."[1]  **Fourth**, in complete derogation of his fiduciary duties to BioZone, Maza sought and received approval from Frost, Honig, and Brauser to pursue external sources of financing, as evidenced by one email Maza wrote to Brauser and copied to Honig, on February 28, 2013, seeking Brauser's concurrence to the proposal of two separate lender proposals which Honig and Frost had already approved.  **Fifth**, Maza provided Frost, Honig, and Brauser with monthly reports of BioZone's business operations and opportunities, such as a business memo sent to them in June 2013 outlining "an approach to stabilize the company" and setting forth "priority initiatives."  **Sixth**, the Honig Group, on August 26, 2013, arranged for BioZone's lopsided issuance to Musclepharm Corporation ("Musclepharm"), another Honig controlled company, of a convertible note with 10% interest for a one year term, coupled with warrants for the purchase of 10 million shares of BioZone stock for $.40 per share on a cashless basis in the event that the BioZone shares were not registered (estimated value of $2.5 million without conversion), in exchange for Musclepharm's investment in BioZone of only $2 million. **Seventh**, on November 12, 2013, the Honig Group sold substantially all of BioZone's assets,

---

[1] The unidentified entity may be Non-Invasive Monitoring Systems, Inc. ("NIMS").  According to NIMS's quarterly report for the first quarter of 2019 ended April 30, 2019 (the "NIMS Q1 2019 10-Q"), NIMS rents office space from Defendant Frost, which "In February 2016…was reduced to $0 per month."

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT 14

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

including its intellectual property and manufacturing facility, to Musclepharm in return for 1.2 million shares of Musclepharm' s stock, without even the knowledge of Maza, BioZone's CEO.

38.     The SEC Complaint alleges that Keller and Maza breached their fiduciary duties to BioZone and its shareholders by failing to disclose that BioZone was controlled by Honig, Brauser, Stetson, and Groussman when Keller and Maza signed off on public filings that failed to disclose the latter's involvement as a group of greater than 5% owners of BioZone.  The control exerted by the Honig Group over BioZone is not only demonstrated by the Group's collective BioZone stockholdings, but through internal documents reviewed by the SEC, including an email from Keller to a colleague on February 12, 2012, stating: "The real power is with Barry Honig and Mike Brauser, Elliot [Maza] is just mouth piece."

39.     On December 8, 2011, Fisher filed a whistleblower complaint with the SEC, alleging that Frost, Maza, Honig and Brauser perpetrated a fraud upon BioZone and its shareholders (the "Whistleblower Complaint").  In the Whistleblower Complaint, Fisher alleged that Frost, Honig, Maza, and Brauser filed false and misleading statements with the SEC in an effort to boost BioZone's stock price so that they could reap substantial profits selling their BioZone holdings.

40.     On January 30, 2012, Maza and BioZone's Board terminated Fisher's employment with BioZone.  On July 16, 2012, Fisher sued BioZone, Frost, Maza, Honig, and Brauser in the United States District Court for the Northern District of California (No. 12-03716) for, among other things, conversion, wrongful termination, tortious interference, violations of securities laws, and to compel payment of the 6.65 million BioZone shares he was originally promised, but never received. On July 18, 2012, BioZone sued Fisher in the New York Supreme Court (Index No. 652489/2012) alleging breach of contract, breach of fiduciary duty, fraud, negligence, and seeking to recover damages, past wages and cancellation of the 6.65 million BioZone shares owed to Fisher.  On September 5 and 10, 2013, with the direct initiative and involvement of Brauser, as he was directed

BRESKIN **|** JOHNSON **|** TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

by Honig, the competing claims between Fisher, BioZone and the other defendants were settled for payment of $1.05 million cash to Fisher, the sale by Fisher to "various private accredited investors" of his 6.65 million BioZone shares (for approximately $1 million), and Fisher's agreement to dismiss all administrative claims and investigations he instituted with state or Federal agencies against BioZone and to remain bound by the non-competition terms contained in his former employment agreement with BioZone.

41.     According to the SEC complaint, between March 2011 and June 2012, the fifteen month period following the Surf reverse merger by which BioZone went public, Defendants Frost, Honig, and Brauser engaged in additional PIPE financings of BioZone, including the issuance of warrants for additional shares.  By doing so, BioZone's liquidity was kept to a minimum, with just enough funds on hand to keep BioZone liquid, while simultaneously designating the funds available to pay out excessive compensation to Defendants Maza and Keller.  A casualty of this strategy was BioZone's research and development efforts, which were not funded and ceased by mid-2012.

42.     As a result of their strategy to profit at the expense of BioZone and its shareholders, Frost, Honig, and Brauser were able to purchase ever-increasing amounts of BioZone shares at ever-decreasing prices.  Defendants Maza and Keller repeatedly approved the PIPE financings that would inevitably lead to a death spiral of BioZone because, as the SEC alleges, Maza and Keller were promised and awarded "substantial salaries as well as millions of [BioZone] shares, by [the company's] real control persons."  At roughly the same time, in September and October 2013, Honig and Brauser sold BioZone convertible debt to Stetson and O'Rourke, giving Stetson and O'Rourke the right to purchase BioZone's stock for $0.20 per share.

43.     As of April 2013, the Honig Group, together with other persons that were added to the group, and as part and parcel of the expanded group's agreement to acquire, hold or sell their shares together, controlled 44,888,312 shares, or 71%, of BioZone's outstanding equity, which was

never disclosed, notwithstanding the rules requiring such disclosure and their fiduciary duties requiring same.  In fact, Honig alone owned 5,542,654 shares, or 8.8%, of BioZone's outstanding shares as of this time, but this was never properly disclosed until September 2013, when Stetson notified Maza and Keller that the beneficial ownership table should be amended to reflect Honig's 8.8% ownership.  On September 13, 2013, BioZone filed with the SEC an amended Annual Report on Form 10-K/A that belatedly disclosed Honig's share ownership without providing explanation as to why such disclosure was not made earlier.

44.     Between August and September 2013, in breach of their fiduciary duties, Honig directed Stetson to deposit 4 million of Honig's BioZone shares into a brokerage account, to falsely represent to the brokerage firm that there was no connection between Honig and BioZone, and to procure false attorney opinion letters to be delivered to BioZone's transfer agent unlawfully removing the trading restrictions on Honig's stock certificates.

45.     On September 10, 2013, in breach of his fiduciary duties, Maza wrote a letter confirming the authenticity of Honig's stock certificates to the brokerage firm:  "[w]e further acknowledge and agree that there is no other agreement or understanding between Barry Honig and [BioZone] that would preclude Honig from selling or otherwise disposing of shares represented above."  As alleged in the SEC Complaint, the foregoing statement was false because Defendant Maza knew or should have known that Honig was affiliated with BioZone, and that the shares sought to be registered with the brokerage firm were subject to volume trading limitations under the federal securities laws because Honig was an affiliate of BioZone.

46.     In September 2013, after Honig's shares were deposited in the brokerage account and ready for sale, Honig directed O'Rourke to pay Ford 180,000 shares of BioZone stock to write an article to create interest in BioZone and, thereby, its stock price, in violation of the federal securities laws and in breach of his fiduciary duties.

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT 17

BRESKIN | JOHNSON | TOWNSEND <sup>PLLC</sup>
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

47.     O'Rourke, in breach of the federal securities laws and his and the Honig Group's fiduciary duties, proceeded to contact Ford, proposed that Ford write an article promoting BioZone predicated upon Frost's involvement in BioZone and its bright R&D prospects connected with the development of the Qusomes formulation, despite the fact that such research and development efforts had already ceased, and he agreed to pay Ford with BioZone shares to be sold to Ford at a below-market price.

48.     As part of the scheme to "pump and dump" BioZone stock in violation of the federal securities laws and in breach of their fiduciary duties, the Defendants engaged in heavy trading of the BioZone's stock on September 23, 2013, causing the trading volume to soar to 302,000 shares from the zero shares traded the day before.

49.     Moreover, the heavy trading on September 23 provided cover for paying Ford with 180,000 underpriced shares of BioZone stock.  As alleged in the SEC Complaint:

> On the morning of Friday, September 20, 2013, O'Rourke called Ford and told him to put in buy orders for [BioZone] stock at $0.40 per share to ensure his order was executed against the corresponding sell order later placed by Honig. Because there was so little trading at that time in [BioZone] shares, O'Rourke and Honig knew that Ford's bid would be hit by Honig on the following Monday, September 23, 2013. In that transaction, Honig sold 180,000 [BioZone] shares to Ford at $0.40 per share, a price well below the price at which these shares otherwise traded during that day.

50.     In further violation of the federal securities laws and in breach of their fiduciary duties, the Defendants then proceeded to artificially manipulate and inflate the trading price of BioZone's stock by engaging in synchronized trading designed to do just that.  For example, according to the SEC Complaint, at 3:58 p.m. on September 23, 2013, the very end of the trading day, O'Rourke – through one of his related entities – placed a bid to buy BioZone shares at $0.68 per share – substantially more than the prior buy order of $0.55 per share, which was entered at about 3:06 p.m. – in order to "'mark the close,' *i.e.*, to ensure that the last price of the day would be higher, giving the false impression that [BioZone's] share price was on an upward trajectory."

According to the SEC Complaint, another Honig associate who purchased BioZone shares from Honig earlier that day placed a corresponding sell order to complete the transaction at the inflated $0.68 per share price.

51.     Similarly, according to the SEC Complaint, on September 26, 2013, Honig, O'Rourke and other of their associates engaged in further synchronized trading within minutes of each other in order to raise the price of BioZone's stock to $0.68 per share, in violation of the federal securities laws and in further breach of their fiduciary duties.

52.     On September 26, 2013, Ford published on *Seeking Alpha*, a financial news website, the propaganda piece solicited and paid for by the Defendants, in breach of the federal securities laws and its fiduciary duties, entitled "OPKO and its Billionaire CEO Invested in BioZone."  In the article, Ford praised BioZone, quoting Keller regarding the benefits of BioZone's proprietary Qusomes anti-aging technology, stressing the confidence placed in the technology by virtue of the investment of Frost, a career biotech investor, and falsely representing that BioZone had a Qusomes formulation ready to be tested and brought to market.

53.     Ford's article on BioZone swiftly sent BioZone's stock price soaring upward from a mere 1,100 shares traded on September 25, 2013 to over 4.5 million shares traded on September 27, 2013, and more than 6 million shares traded on October 2, 2013.  In the wake of Ford's article, BioZone's stock price rose from an average of $0.48 per share in August 2013 to an intraday high of $0.97 per share on October 17, 2013.

54.     Between October 1 and October 4, 2013, Defendant Frost, in violation of the federal securities laws and in breach of his fiduciary duties, sold 1,987,991 BioZone shares for proceeds of $1,085,321.74, never having filed a registration statement for the sale of his shares, or filing for an exemption from registration, and in violation of the applicable volume limitations on sale as a result of Frost's control of BioZone by virtue of his being a director of BioZone and a part of the Honig

Group.

55.     On November 27, 2013, BioZone, now stripped of its assets and rendered a mere shell by the sale of virtually all of its assets and intellectual property to Musclepharm earlier that month, issued a press release entitled: "BioZone Pharmaceuticals Announces Executed Letter of Intent to Merge with Cocrystal Discovery Inc."  The press release extolled the prior "strategic" investments from Teva, OPKO, and the Frost Group LLC (the "Frost Group"), a Miami private investment firm led by Frost,[2] the latter two of which owned 40% of Cocrystal Discovery. Defendant Wilcox, the CEO and Chairman of Cocrystal Discovery would continue in that role after the merger.  Defendants Frost and Hsiao were also Cocrystal Discovery directors at that time. Defendant Frost was quoted saying that the "merger will provide greater resources to help bring products of the combined company to market and offer shareholders an opportunity to realize significant value on their investment."  After the merger, BioZone shareholders would own 40% and Cocrystal Discovery shareholders would own 60% of the Company, which would be named Cocrystal Pharma, Inc.

56.     On or about December 26, 2013, Honig and Brauser converted their notes into newly issued BioZone common stock, which they sold for a substantial profit after the closing of the reverse merger with Cocrystal Discovery.

### B.     Other Breaches of Fiduciary Duty

57.     On March 31, 2014, the Company filed its Annual Report on Form 10-K with the SEC for the year ending December 31, 2013 (the "2013 10-K"), the time prior to the closing of the reverse merger with Cocrystal Discovery.  The Company disclosed that, according to the Company's management team prior to 2014 (*i.e.*, before the reverse merger with Cocrystal Discovery), and pursuant to the prior management team's evaluation of the effectiveness of the

---

[2] Defendant Frost's private equity firm which specializes in public equity.

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

design and operation of Cocrystal's disclosure controls and procedures, the Company's controls and procedures were **not** effective "***due to insufficient personnel to properly prepare, implement and monitor adequate controls and procedures***" (emphasis supplied).   Furthermore, the Company represented that:

> as of December 31, 2013, we identified numerous material weaknesses as described below:
>
> Financial Reporting Process
> Description of Material Weakness as of December 31, 2013
> Cocrystal did not maintain an effective financial reporting process to prepare financial statements in accordance with U.S. GAAP. Specifically, our process lacked timely and complete financial statement reviews, appropriate account closing procedures, and appropriate reconciliation processes. Also, Cocrystal lacked documented procedures included documentation related to testing of processes, data validation procedures from the systems into the general ledger, testing of systems, validation of results, disclosure review, and other analytics. Furthermore, Cocrystal lacked sufficient personnel to properly segregate duties.
>
> Information Technology Systems
> Description of Material Weakness as of December 31, 2013
> Cocrystal did not maintain effective internal control over financial reporting related to certain information technology applications and general computer controls that are considered to have an impact on financial reporting and that resulted in a more than reasonable possibility that material misstatements in our financial statements would not be prevented or detected.
>
> Specifically, we lacked effective controls in the following areas:
>
> Access Control — Cocrystal did not maintain effectively designed controls to prevent unauthorized access to certain programs and data, and provide for periodic review and monitoring of access including reviews of security logs and analysis of segregation of duties conflicts.
>
> Change Management — Cocrystal did not maintain effectively designed controls to ensure that all information technology program and data changes were authorized, developer access to the production environment was limited, and that all program and data changes were adequately tested for accuracy and appropriate implementation.
>
> Spreadsheets — Cocrystal did not maintain effectively designed controls to ensure that critical spreadsheets were identified, access to these spreadsheets was restricted to appropriate personnel, changes to data or formulas were authorized and appropriate, or that the spreadsheets were adequately reviewed by someone other than the preparer.

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT 21

Therefore, our internal controls over financial reporting were not effective as of December 31, 2013.

58.     Conversely, with regard to the period after the merger with Cocrystal Discovery, the 2013 Form 10-K stated that "[c]urrent management believes that its controls are effective."

59.     The Company's Annual Report on Form 10-K for the year ended December 31, 2014, filed with the SEC on March 31, 2015, disclosed that the Company's controls and procedures even after the merger with Cocrystal Discovery were *not* effective "*due to insufficient personnel to properly prepare, implement and monitor adequate controls and procedures*" (emphasis supplied). Furthermore, the Company represented that:

> During our assessment of the effectiveness of internal control over financial reporting as of December 31, 2014, we identified the following material weakness:
>
> Financial Reporting Process
> Description of Material Weakness as of December 31, 2014
> Cocrystal did not maintain an effective financial reporting process to prepare financial statements in accordance with U.S. GAAP. Specifically, our process lacked timely and complete financial statement reviews and procedures to ensure all required disclosures were made in our financial statements. Also, Cocrystal lacked documented procedures including documentation related to testing of internal controls and entity-level controls, disclosure review, and other analytics. Furthermore, Cocrystal lacked sufficient personnel to properly segregate duties.
>
> Therefore, our internal controls over financial reporting were not effective as of December 31, 2014.
>
> * * *
>
> In the fourth quarter of the year ended December 31, 2014, we implemented procedures to remediate our previously reported material weakness relating to our accounting for complex financial instruments. We previously reported that we did not maintain effective controls over the identification and proper accounting treatment of certain terms and conditions in agreements that contained complex financial instruments, including derivatives. During the fourth quarter of the year ended December 31, 2014, we implemented processes to utilize outside consultants, where necessary, to assist us in our evaluation of the accounting for complex transactions containing complex financial instruments or derivatives. When we enter into such agreements, we consult with such specialists and use their expertise to help us evaluate the appropriate accounting treatment for these

transactions. We believe implementation of these processes has remediated our previously reported material weakness.

60.      The Company's Annual Report on Form 10-K for the year ended December 31, 2015, filed with the SEC on March 15, 2016, disclosed that the Company's controls and procedures were **not** effective "***due to inadequate accounting systems and insufficient personnel to properly prepare, implement and monitor adequate controls and procedures***" (emphasis supplied). Furthermore, the Company represented that:

> During our assessment of the effectiveness of internal control over financial reporting as of December 31, 2015, we identified the following material weakness:
>
> *COSO Components – Control Environment*
>
> We did not maintain an effective control environment, which is the foundation and structure necessary for effective internal control over financial reporting, as evidenced by: (i) lack of segregation of duties over individuals responsible for certain key control activities; (ii) an insufficient number of personnel appropriately qualified to perform control monitoring activities, including the recognition of the risks and complexities of transactions; and (iii) an insufficient number of personnel with the appropriate level of GAAP knowledge and experience commensurate with our financial reporting requirements. This control environment material weakness contributed to the company not having effective controls to ensure that potential errors or misstatements may occur, but may not be detected.
>
> *Risk Assessment, Monitoring Activities and Control Activities - Segregation of Duties*
>
> We did not maintain adequate segregation of duties in our accounting and financial reporting processes. We have not appropriately restricted access to our accounting applications to appropriate users and do not have processes in place that ensure that appropriate segregation of duties is maintained. Certain personnel have access to financial applications, programs and data beyond that needed to perform their individual job responsibilities and without independent monitoring. This allows for the creation, review and processing of certain financial data without independent review and authorization. There are also certain financial personnel that have incompatible duties, including in the areas of cash disbursements, payroll, and journal entry reviews. We have not yet completed the process of assigning different people the responsibilities of authorizing transactions, recording transactions, and maintaining custody of assets to reduce the opportunities to allow any person to be in a position to both perpetrate and conceal errors or fraud in the normal course of the person's duties. Particularly in

the areas of purchases, cash disbursements, and payroll, certain individuals have incompatible duties that limit our ability to identify and detect errors or fraud that may occur.

*Risk Assessment, Monitoring Activities and Control Activities - Supervision and Review of Complex Accounting Areas*

The Company lacks sufficient qualified personnel to review conclusions reached regarding the accounting for complex transactions and related analyses to record amounts resulting from such transactions in our financial records. For calculations related to stock-based compensation and the fair value of our derivative liabilities in particular, there is a lack of review of assumptions used and the underlying calculations made by the preparer of this information that are then used to record amounts in our financial statements. There is also a lack of review of assumptions used and documentation of the sources of information used in our evaluation of the fair value of our in-process research and development intangible asset. Our internal control over these processes would not allow for employees to detect a material misstatement in these areas in the normal course of performing their duties.

*Risk Assessment, Information and Communication - Authorization, Identification and Reporting of Related Party Transactions*

We do not have processes in place to ensure that all related party transactions, including those entered into with or on behalf of related parties, (1) have been identified, (2) are properly authorized prior to entering into the transaction, and (3) are properly monitored and evaluated for appropriate recording and presentation in the financial statements.

*Monitoring Activities and Control Activities - Financial Reporting Process*

We did not maintain an effective financial reporting process to prepare financial statements in accordance with U.S. GAAP. Specifically, our process lacked timely and complete financial statement reviews and procedures to ensure all required disclosures were made in our financial statements. We also lacked a process to review information used to prepare our financial statements and disclosures and did not have adequate segregation of duties over preparation of the financial statements.

The material weaknesses identified by management could result in a material misstatement to our annual or interim financial statements that would not be prevented or detected. Management has concluded that our internal control over financial reporting was not effective as of December 31, 2015 due to the material weaknesses identified. We reviewed the results of management's assessment with the Audit Committee of the Company's Board of Directors.

61.    The Company's Annual Report on Form 10-K for the year ended December 31,

2016, filed with the SEC on March 31, 2017, disclosed that the Company's disclosure controls and procedures were **not** effective "**as a result of the material weaknesses in our internal control over financial reporting**" (emphasis supplied). Furthermore, the Company represented that:

> During our assessment of the effectiveness of internal control over financial reporting as of December 31, 2016, our management concluded that our Company has the following material weaknesses in internal control over financial reporting as of December 31, 2016:
>
> *Control Environment*
>
> We did not maintain an effective control environment, which is the foundation and structure necessary for effective internal control over financial reporting, as evidenced by: (i) lack of segregation of duties over individuals responsible for certain key control activities; (ii) an insufficient number of personnel appropriately qualified to perform control monitoring activities, including the recognition of the risks and complexities of transactions; and (iii) an insufficient number of personnel with the appropriate level of GAAP knowledge and experience commensurate with our financial reporting requirements. This control environment material weakness contributed to the company not having effective controls to ensure that potential errors or misstatements may occur, but may not be detected.
>
> *Risk Assessment, Monitoring Activities and Control Activities - Segregation of Duties*
>
> We did not maintain adequate segregation of duties in our accounting and financial reporting processes. We have not appropriately restricted access to our accounting applications to appropriate users and do not have processes in place that ensure that appropriate segregation of duties is maintained. Certain personnel have access to financial applications, programs and data beyond that needed to perform their individual job responsibilities and without independent monitoring. This allows for the creation, review and processing of certain financial data without independent review and authorization. There are also certain financial personnel that have incompatible duties, including in the areas of cash disbursements, payroll, and journal entry reviews. We have not yet completed the process of assigning different people the responsibilities of authorizing transactions, recording transactions, and maintaining custody of assets to reduce the opportunities to allow any person to be in a position to both perpetrate and conceal errors or fraud in the normal course of the person's duties. Particularly in the areas of purchases, cash disbursements, and payroll, certain individuals have incompatible duties that limit our ability to identify and detect errors or fraud that may occur.
>
> *Risk Assessment, Monitoring Activities and Control Activities - Supervision and Review of Complex Accounting Areas*

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT 25

**BRESKIN | JOHNSON | TOWNSEND** PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

The Company lacks sufficient qualified personnel to review conclusions reached regarding the accounting for complex transactions and related analyses to record amounts resulting from such transactions in our financial records. For calculations related to stock-based compensation and the fair value of our derivative liabilities in particular, there is a lack of review of assumptions used and the underlying calculations made by the preparer of this information that are then used to record amounts in our financial statements. There is also a lack of review of assumptions used and documentation of the sources of information used in our evaluation of the fair value of our in-process research and development intangible asset. Our internal control over these processes would not allow for employees to detect a material misstatement in these areas in the normal course of performing their duties.

*Risk Assessment, Information and Communication - Authorization, Identification and Reporting of Related Party Transactions*

We do not have processes in place to ensure that all related party transactions, including those entered into with or on behalf of related parties, (1) have been identified, (2) are properly authorized prior to entering into the transaction, and (3) are properly monitored and evaluated for appropriate recording and presentation in the financial statements.

*Monitoring Activities and Control Activities - Financial Reporting Process*

We did not maintain an effective financial reporting process to prepare financial statements in accordance with U.S. GAAP. Specifically, our process lacked timely and complete financial statement reviews and procedures to ensure all required disclosures were made in our financial statements. We also lacked a process to review information used to prepare our financial statements and disclosures and did not have adequate segregation of duties over preparation of the financial statements.

The material weaknesses identified by management could result in a material misstatement to our annual or interim financial statements that would not be prevented or detected. Management has concluded that our internal control over financial reporting was not effective as of December 31, 2015 due to the material weaknesses identified. We reviewed the results of management's assessment with the Audit Committee of the Company's Board of Directors.

62.    The Company's Annual Report on Form 10-K for the year ended December 31, 2017, filed with the SEC on March 21, 2018 (the "2017 Form 10-K"), disclosed that the Company's disclosure controls and procedures were not effective "***as a result of the material weaknesses in our internal control over financial reporting***" (emphasis supplied).   Furthermore, the Company represented that:

> During the year ended December 31, 2016, management identified certain material weaknesses related to (i) an effective control environment; (ii) inadequate segregation of duties in our accounting and financial reporting processes; (iii) inadequate supervision and review of complex accounting areas; (iv) inadequate processes to authorize, identify, and report related party transactions; and (v) an ineffective financial reporting process with respect to preparation of financial statements in accordance with U.S. GAAP. To remediate the material weaknesses, during 2017, we designed and implemented a comprehensive remediation plan to remediate the material weaknesses and generally strengthen our internal control over financial reporting. During the fourth quarter of 2017, we successfully completed the testing necessary to conclude that certain material weakness identified in 2016 had been remediated. However, management concluded that some of the previously identified material weaknesses were not remediated as of December 31, 2017, primarily due to the additional time needed to incorporate all controls and processes as it relates to our internal control over financial reporting.

> During our assessment of the effectiveness of internal control over financial reporting as of December 31, 2017, our management concluded that our Company has the following material weaknesses in internal control over financial reporting as of December 31, 2017:

> *Risk Assessment and Control Activities - Financial Reporting Process*

> We did not maintain an effective financial reporting process to prepare financial statements in accordance with U.S. GAAP. Specifically, the process lacked timely and documented financial statement reviews of information included in the financial statements and procedures to ensure all required disclosures were made in the financial statements.

> This material weakness could result in a material misstatement to the Company's annual or interim financial statements that would not be prevented or detected.

> *Control Activities - Preparation and Review of Manual Account Reconciliations*

> Our design and maintenance of controls in the period-end financial reporting process, specifically the execution of controls over the preparation, analysis and review of account reconciliations, were ineffective. These control deficiencies

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT 27

resulted in adjustments to the 2017 consolidated financial statements related to stock-based compensation and the fair value of warrant liabilities.

### C.    The False and Misleading 2018 Proxy Statement

63.    On June 25, 2018, the Company filed the 2018 Proxy with the soliciting shareholders' votes to, among other things, "approve, on an advisory basis, Cocrystal's Named Executive Officer compensation."   In the Compensation Discussion and Analysis section of the 2018 Proxy, the Company stated the following, in relevant part:

> Our compensation philosophy is to attract and retain talented and dedicated executives who will work to achieve our desired business direction, strategy, and performance. The primary goals of our compensation program for our NEOs are to:
>
> (i)    attract, motivate, and retain talented executives with the skill sets and expertise we need to meet our scientific and business objectives;
>
> (ii)    generally be competitive in the marketplace; and
>
> (iii)    be cost-effective.
>
> To achieve these goals, we have formed a Compensation Committee (the "Committee") that has the power to review and approve the executive compensation packages for our executive officers, including NEOs. Although we have not adopted any formal guidelines for allocating total compensation between equity compensation and cash compensation, we maintain compensation plans that if implemented can tie a substantial portion of our executives' overall compensation to the achievement of corporate goals and success of the Company.

(Emphasis added).

64.    The foregoing statements are materially false and misleading because as discussed in detail above and as evidenced by the Company's public filings with the SEC, the Compensation Committee reviewed, authorized and/or approved the payment of compensation to the Director Defendants that was inconsistent with the statements made in the 2018 Proxy.

### D.    Related Party Transactions

65.    In Cocrystal's 2017 Form 10-K, as amended, the following related party transactions

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT 28

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

are disclosed for the first time, which were entered into in breach of the Defendants' fiduciary duties:

> (i) Since November 2014, the Company has leased its Tucker, Georgia facility from a limited liability company owned by Schinazi. Rent expense for 2017 totaled $153,000. In January 2018, the Company reduced its lease from approximately 6,148 square feet to approximately 1,200 square feet;

> (ii) Cocrystal has entered into certain license agreements to which Emory University ("Emory") is directly, or indirectly, a party. Due to Schinazi's relationship with Emory and his contributions to the intellectual property and technology which are the subject of the licenses, he may, in the future, be entitled under these agreements to payments of material amounts from Emory University or its partners;[3]

> (iii) On April 20, 2017, the Company sold 416,664 shares of the Company's common stock in a private placement offering at a purchase price of $7.20 per share for gross proceeds of $3,000,000. The purchasers included Schinazi and OPKO (which received 138,889 shares of Cocrystal common stock);

> (iv) On November 24, 2017, the Company borrowed $500,000 from each of Schinazi and Brace Pharma, in which Schinazi is a director, in exchange for two-year 8% convertible notes each in the principal amount of $500,000, which will automatically convert into the Company's common stock if the Company receives $10 million or more in gross proceeds from a public offering of Company stock or any other equity financing transaction; and

> (v) On January 31, 2018, the Company borrowed $1,000,000 from OPKO in exchange for a two-year 8% convertible note in the principal amount of $1,000,000, which will automatically convert into 123,456 shares of the Company's common stock if the Company receives $10 million or more in gross proceeds from a public offering of Company stock or any other equity financing transaction.

### E.    The SEC and Investors File Complaints

66.    On September 7, 2018, the SEC brought suit against Defendants Honig, Stetson, Brauser, O'Rourke, Maza, Keller, the Frost Gamma Investment Trust, OPKO, and other named defendants for, amongst other things, manipulation of Cocrystal stock in a pump and dump scheme. The SEC Complaint was filed in the Southern District of New York before the Honorable Edgardo

---

[3] On Dec. 6, 2018, the Company notified Emory of the termination of its License Agreement with Emory, dated March 7, 2013.

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

Ramos.  According to the SEC, Honig led the $27 million "pump and dump" scheme to which Cocrystal was subjected.

67.     Defendant Frost's settlement with the SEC was approved by Judge Ramos on January 10, 2019.  Frost agreed to pay disgorgement of $433,181, plus $90,206 in interest, and a civil penalty of $5,000,000.  Frost also consented to being permanently enjoined from: participating in any penny stock offering with few exceptions; violating Section 17(a)(2) by making materially untrue statements or omissions in connection with sales of securities; violating Section 13(d) and Rule 13d-1(a) by failing to file required stock-ownership reports on Schedule 13D; and violating Sections 5(a) and (c) by selling unregistered securities.

68.     On March 8, 2019, the SEC filed an Amended Complaint against the remaining Defendants.  On March 21, 2019, Defendant Maza settled the SEC's claims against him and agreed not to serve as a director of officer of any penny stock company.  Maza further agreed not to violate Section 10(b) of the Exchange Act, Rule 10b-5, and Section 17(a) of the Securities Act, as well as to refrain from aiding and abetting any violation of Section 15(d) of the Exchange Act and Rule 15d-1.  The Court will decide if Maza should pay any disgorgement or penalties.

69.     Defendant Keller settled with the SEC on March 26, 2019.  Under the terms of a consent judgment, Keller was permanently enjoined from:  violating Sections 10(b) and 15(d) of the Exchange Act, Rules 10b-5 and 15d-1, and Section 17(a) of the Securities Act, participating in any penny stock offering, or acting as an officer or director of any public company.  The Court will decide if Keller should pay any disgorgement or penalties.

70.     Defendant Honig settled with the SEC on June 17, 2019.  Under the terms of the consent judgment, Honig was barred from violating Sections 10(b), 9(a)(1), 9(a)(2), and 13(d) of the Exchange Act, Sections 17(a) and 5 of the Securities Act, and Rules 10b-5 and 13d-1(a).  Honig was also prohibited from holding 5% or more beneficial ownership of any penny stock issuer, or

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

promoting, controlling, or funding any penny stock issuer.  The Court will decide if Honig should pay any disgorgement or penalties.

71.    On June 25, 2019, an amended securities class action complaint was filed in the District of New Jersey, naming Cocrystal, Maza, Wilcox, Meckler, McGuire, Martin, Dale, Frost, Honig, Stetson, O'Rourke, and Keller.  The Complaint alleges that from at least September 23, 2013 through at least September 7, 2018, Defendants violated:

- Section 10(b) of the Exchange Act and Rule 10b-5;

- Section 9(a) and (f) of the Exchange Act;

- Section 20(a) of the Exchange Act; and

- Section 20(b) of the Exchange Act.

## THE COCRYSTAL DEFENDANTS' FIDUCIARY DUTIES

72.    By reason of their positions as officers and/or directors of Cocrystal and because of their responsibility to control the business and corporate affairs of the Company, the Cocrystal Defendants owed and owe the Company and its shareholders the fiduciary obligations of good faith, loyalty, and due care, and were and are required to use their utmost ability to control and manage the Company in a just, honest, fair, and equitable manner.  Each Cocrystal Defendant owed and owes the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company.

73.    To discharge their duties, the Cocrystal Defendants were and are required to exercise reasonable and prudent oversight and supervision over the management, policies, practices, and controls of Cocrystal and its financial reporting systems.  By virtue of such duties, the Cocrystal Defendants were and are required to follow the Company's Code of Business Conduct and Ethics. In addition, the Cocrystal Defendants serving on the Board's three standing committees, the Audit Committee, the Compensation Committee, and the

Nominating and Corporate Governance Committee, are further obligated to uphold the special duties set forth in the charters for each respective committee.

### A.  Cocrystal's Code of Business Conduct and Ethics

74.  Cocrystal's Code of Business Conduct and Ethics was adopted by the Board to serve as a framework under which the Board is required to fulfill its duties with expertise, integrity, and an understanding of the Company's business environment.  Violations of Cocrystal's Code of Business Conduct and Ethics are punishable by penalties and/or termination of employment.  As required by the Dodd-Frank Wall Street Reform and Consumer Protection Act, the Cocrystal Defendants were and are required to refrain from engaging in misconduct, and to claw back compensation from officers engaged in knowing misconduct, including violations of applicable law and NASDAQ rules.  The Cocrystal Defendants were and are obligated to file full, accurate, and timely reports and public communications with the SEC.

75.  Among the duties imposed by the Code of Business Conduct and Ethics are:

- Maintaining complete and accurate Company records;

- Practicing good leadership and fair supervision;

- The prohibition of trading on any stock by persons who are aware of material nonpublic information;

- Seeking approval from Cocrystal's general counsel before any director or officer can engage in transactions involving Company securities;

- Refraining from trading on material nonpublic information even after the conclusion of employment with Cocrystal;

- The prohibition of short selling and hedging (including placing puts or calls on) Cocrystal securities;

- Refraining from tipping off others to material nonpublic Company information; and

- Maintaining confidentiality of Company information.

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT 32

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

## B.      Additional Fiduciary Duties of the Audit Committee Members

76.      In addition to the fiduciary duties described above, the members of the Board's Audit Committee are responsible for monitoring the "major financial risk exposures and the steps management has taken to monitor and control such exposures."   The Audit Committee charter obligates members to review and discuss with management and the Company's independent auditor, the integrity and accuracy of the Company's financial statements and public disclosures. Defendant Rubin is Chair and Defendant Frost is a member of the Audit Committee.

77.      The Audit Committee Charter provides that the Audit Committee shall meet with the Board four times each year to ensure Cocrystal's public filings with the SEC are in compliance with the law.  The Charter further provides that the members of the Audit Committee shall, among other things:

- Maintain a procedure for receipt, retention and treatment of any complaints received by the Company about its accounting, internal accounting controls or auditing matters and for the confidential and anonymous submission by employees of concerns regarding questionable accounting or auditing matters;

- Evaluate the performance of the Committee, review and reassess this Charter and, if appropriate, recommend changes to the Board; and

- Review with management and the Company's independent auditor any issues related to the Company's accounting or internal controls.

78.      The Audit Committee Charter further provides that no member of the committee shall serve as an "affiliate of the Company or any subsidiary of the Company, other than a director who meets the independence requirements of the Nasdaq."

## C.      Additional Duties of the Compensation Committee Members

79.      The Compensation Committee is comprised of Defendants Hsiao and Rubin.  Hsiao and Rubin are charged with determining the appropriate compensation for executive officers,

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT 33

**BRESKIN | JOHNSON | TOWNSEND** <sup>PLLC</sup>
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

establishing distribution plans and administering payments pursuant to those plans.  Additionally, the members of the Compensation Committee are charged with approving the compensation for and reviewing the performance of Cocrystal's CEO, Defendant Wilcox.

**D. Additional Duties of the Nominating and Corporate Governance Committee**

80.     The Nominating and Corporate Governance Committee consists of Defendants Hsiao (Chair) and Rubin.  However, the Committee's own charter requires a membership of not less than three independent members.

81.     In discharging their duties, the members of the Nominating and Corporate Governance Committee were and are responsible for reviewing policies on the composition and criteria for continued membership on the Board.  Additionally, members of the Nominating and Corporate Governance Committee were and are charged with reasonable oversight concerning the implementation and effectiveness of the compliance and ethics program, including inquiry into the "background and qualifications of any candidate for the Board of Directors and such candidate's compliance with the independence and other qualification requirements

established by the Committee."

**E. The Controlling Shareholders' Duties**

82.     The controlling shareholders, by virtue of their majority interest in Cocrystal's voting stock and their actual control over the Company's affairs and conduct, had a fiduciary responsibility to control the corporation in a fair, just, and equitable manner.

83.     The controlling shareholders had a duty to ensure that their use of control benefits all shareholders proportionately and had a duty to abstain from using their ability to control corporate activities to benefit themselves or in a manner detrimental to the minority.  This included the pump and dump scheme which was used to exploit the Company for their own financial gain.  By

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

elevating the price of Cocrystal stock through paid articles and then selling that stock the controlling shareholders caused the Company's stock to trade at artificially inflated prices only to fall precipitously and has led to a potentially material liability to a class of investors who have initiated class action litigation against the Company, among others.

84.     As controlling shareholders standing on both sides of the related party transactions, they had a fiduciary duty to ensure the entire fairness of the transactions, irrespective of any purported personal business objective or judgment, to Plaintiff and other minority shareholders.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

85.     Plaintiff will adequately and fairly represent the interest of Cocrystal and its shareholders in enforcing and prosecuting their rights.

86.     Plaintiff seeks to redress injuries suffered and to be suffered by the Company as a direct result of the violations of fiduciary duty by the Defendants, as well as aiding and abetting.

87.     Plaintiff did not demand that Cocrystal's Board take the action requested herein because doing so would constitute a wasteful, futile and useless act.  The named Defendants, individually and in concert, breached their fiduciary duties of good faith, loyalty, and due care, and were derelict in the performance of their fiduciary duties to manage Cocrystal fairly, justly, honestly, and equitably.  Furthermore, the personal conflicts of interest faced by a majority of the current directors raise reasonable doubt as to whether these individuals are capable of acting independently and impartially.

88.     The Defendants knew or disregarded the lack of internal controls over, among other things, financial reporting and disclosure requirements.  Notwithstanding the obvious risks posed to Cocrystal and its shareholders from a material weakness in such internal controls, the Defendants failed to ensure that corporate actions were being taken for the benefit of the Company and its shareholders rather than to benefit themselves, that material information was disclosed in

compliance with SEC rules and regulations, failed to comply with the Company's own Code of Business Conduct and Ethics, failed to hold the Company's directors, officers, and employees accountable for their violations of the federal securities laws and the Company's own policies, failed to ensure that an effective system of internal controls was implemented and maintained, and failed to perform their proper level of oversight duties as directors of the Company.

89.     A majority of the Board faces a substantial likelihood of liability for breaches of fiduciary duty for the alleged misconduct that cannot be exculpated due to their participation or acquiescence in the wrongs alleged herein and/or failures to comply with the Company's Corporate Governance Guidelines.  Furthermore, they cannot be said to be independent from each other or from those facing a substantial likelihood of liability.  At all relevant times, the Board participated in the misconduct alleged herein or did not perform the proper level of oversight over the Company, as is their fiduciary duty.

90.     The Cocrystal Board consists of elven (11) directors.  Each faces a substantial likelihood of personal liability for their breaches of the duties of trust, loyalty, good faith, candor, oversight, reasonable inquiry, supervision, and due care described herein.  As such, they cannot make an impartial decision as to whether to institute legal proceedings against those alleged to have committed wrongdoing.  Therefore, demand would be futile as to at least a majority of the Cocrystal Directors.

### A.     The Directors Face a Substantial Likelihood of Liability

91.     The Director Defendants have participated in, known, disregarded and/or directly benefitted from the wrongs complained of herein.

92.     Cocrystal has been, and will continue to be exposed to significant losses due to the wrongdoing complained of herein.  The Director Defendants have not attempted to recover the

damages the Company has suffered or will suffer thereby.  Furthermore, the Director Defendants have not taken any action against the parties responsible for the wrongdoing alleged and permitted them to continue to officiate in the same capacities as they served at the time of the wrongdoing alleged

93.    Each of the Director Defendants faces a substantial likelihood of liability for his or her own individual misconduct.  Each had a fiduciary duty to ensure that the Company's SEC filings, accounting statements, press releases, and other public statements and presentations on behalf of the Company were complete and accurate.  Each failed to ensure that material information was timely disclosed, rather than concealed, and that proper and adequate internal controls and governance procedures were in place and followed.

94.    The Directors owed and continue to owe a further duty to ensure that information about the effectiveness of the Company's internal controls was accurate, that disclosure controls and procedures were effective, and that material changes in risk factors were disclosed.  Further, the Directors were and are obligated to oversee the internal governance and accounting controls and procedures to ensure that SEC filings accurately reflected the Company's true financial condition and business prospects.

95.    Moreover, the Director Defendants comprising the Audit Committee and Nominating and Corporate Governance Committees were particularly derelict in discharging in good faith and with the required due diligence and due care their responsibilities.  These Defendants either participated in or turned a blind eye to the "pump and dump" scheme complained of herein. They also failed to make certain that adequate controls and procedures were in place to prevent such an illegal scheme from being perpetrated to the detriment of the Company and its shareholders.

96.    These Director Defendants, if demand were made of them, would have to evaluate whether to sue themselves and/or their fellow directors in evaluating the wrongdoing alleged and

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT 37

**BRESKIN | JOHNSON | TOWNSEND** PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

the request to bring an action for their breaches of fiduciary duties. This is not something they would or could do. Therefore, these Director Defendants cannot act in a manner necessary to preserve their independence and disinterest.

### B. Demand is Futile as to Defendant Frost

97. Defendant Frost cannot fairly consider a demand with the required disinterest and independence by virtue of his violations of the federal securities laws and breaches of fiduciary duties. Defendant Frost is a named Defendant in the SEC Complaint and other actions and has consented to the entry of an order requiring, among other things, his payment of $5.5 million in penalties to the SEC, disgorgement, prejudgment interest, and a prohibition from buying new penny stocks, as well as restrictions on selling penny stock, connected with his underlying alleged misconduct. He was directly involved in the "pump and dump" scheme, placed his personal interests above the interests of the Company and its shareholders, knew that material information necessary to make the Company's disclosures true and accurate was omitted from the Company's public filings and other statements, and engaged in other breaches of fiduciary duty alleged herein. As such, Defendant Frost cannot be expected to act with disinterest and independence and cannot fairly consider a demand.

### C. Demand is Futile as to Defendants Maza and Keller

98. Defendants Maza and Keller cannot fairly consider a demand with the required disinterest and independence by virtue of their violations of the federal securities and breaches of fiduciary duties. Defendants Maza and Keller are named defendants in the SEC complaint and other actions. In March 2019, Defendants Maza and Keller consented to the entry of judgment against them in the SEC Action providing for their permanent bar from: (i) participating in or being a director or officer of any penny stock company; (ii) violating SEC Rule 10b-5; (iii) violating SEC Rule 15d-1; and (iv) violating Section 17(a) of the Securities Act of 1933, and allowing the SEC to

order the further disgorgement of his ill-gotten gains.  Defendants Maza and Keller were directly involved in the "pump and dump" scheme, placed their personal interests above the interests of the Company and its shareholders, knew that material information necessary to make the Company's disclosures true and accurate was omitted from the Company's public filings and other statements, and engaged in other breaches of fiduciary duty alleged herein.  As such, Defendants Maza and Keller cannot be expected to act with disinterest and independence and cannot fairly consider a demand.

### D.    Demand is Futile as to the Audit Committee Defendants

99.    The Audit Committee directors (Chairman Rubin, Frost, and Brady) also cannot fairly consider a demand with the required disinterest and independence by virtue of their own violations of the federal securities laws and breaches of fiduciary duties.  In fact, Frost has consented to the entry of judgment against him in the SEC Action, entered by the Court on January 10, 2019, agreeing to pay $5.5 million in penalties to the SEC, disgorgement of profits, payment prejudgment interest and prohibiting him from buying new penny stocks, as well as restrictions on his sale of penny stocks, deriving from the wrongful misconduct alleged.

100.    Furthermore, the members of the Audit Committee lack independence and disinterest because they have admitted to violating their duties mandated by the Audit Committee Charter; namely, oversight of: (i) the Company's accounting and financial reporting; (ii) internal control systems; (iii) the performance of the Company's internal audit function and independent auditor; and (iv) ensuring compliance with legal and regulatory requirements.

101.    Moreover, Defendant Rubin cannot exercise independence regarding Frost by virtue of their having a close personal relationship and intertwining business dealings over at least the last five years.

### E.    Demand is Futile as to the Director Defendants for Additional Reasons

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT 39

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

102.    Cocrystal's Board has already demonstrated that it cannot consider a pre-suit demand to bring the claims set forth herein with the required disinterest and independence.  Defendants are on record of making false and misleading statements, failing to disclose material information necessary to make statements complete and accurate, and authorizing corporate actions as part of a pump and dump scheme that were meant to benefit themselves to the detriment of the Company and its shareholders.  The Board has taken no action to address the harm the Defendants' misconduct has caused the Company.

103.    Furthermore, in order to bring this action for breach of fiduciary duties, the members of the Cocrystal Board would be required to sue themselves and/or their fellow directors and officers with whom they have entangling alliances, interests, and dependencies, which they would not do.   As such, the Defendants cannot act in a disinterested and independent manner in considering a demand.  For example:

- Defendants Wilcox, Frost, Hsiao, and Rubin are well-acquainted, having served on the Board of Directors of Cocrystal's predecessors BioZone and Cocrystal Discovery.

- Defendants Frost, Hsiao, and Rubin have long-standing business relationships.   First, Defendant Frost and FGIT own 54,690,325 shares of NIMS common stock, or 35.3% thereof.  Defendant Hsiao is the Chairman and CEO and Defendant Rubin is a member of the NIMS Board.  Second, NIMS rents office space at 4400 Biscayne Boulevard[4] (the "Frost Office Building") for $0 a month from Defendant Frost, who owns almost 36% of NIMS stock through FGIT and individually.  Third, Frost is Chairman of OPKO, Hsiao is its Vice Chairman, CTO, and a director.  Defendant Rubin is EVP-Administration and a director. Fourth, Defendant Frost was the Chairman of OPKO predecessor Exegenics, Inc. ("Exegenics") and Defendant Hsiao was Exegenics' Vice Chairman and CTO while Defendant Rubin was Exegenics' EVP-Administration.  Last, Frost co-founded OPKO with Hsiao in 2007, with Frost being its Chairman, Hsiao its Vice Chairman and CTO, and Rubin a member of its Board.

- Defendants Frost and Hsiao co-founded Ivax in 1986.  Frost was Ivax's CEO; Rubin served as Ivax's Vice President; Secretary, and General Counsel from 2001 until it was sold to Teva in 2006.[5]   Frost then became Teva's Vice Chairman and then Chairman from 2010 until 2015.  Hsiao is the Investment Officer and Rubin is the Secretary & Vice President of

---

[4] Defendant Frost owns this building.
[5] Ivax (Teva) has offices in the Frost Office Building, according to a Yellow Pages listing.

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

the Frost Group. Defendants Frost, Hsiao, and Rubin have also served together on the Board of Directors of Cellular Technical Services Company, Inc. ("CTSC"). CTSC later merged with SafeStich Medical, Inc. ("SafeStitch Medical").[6] Defendants Frost, Hsiao, and Rubin also served together on the Board of SafeStitch Medical, which later merged with TransEnterix, Inc. ("TransEnterix"). Defendant Hsiao is a TransEnterix director.

- Frost and Hsiao have also served as directors of Protalix Biotherapeutics Inc. Additionally, Defendant Frost was Chairman of SearchMedia Holdings Ltd. ("SearchMedia") and Defendant Rubin was a director. Ideation Acquisition, Inc. ("Ideation Acquisition") bought SearchMedia in 2009. Frost was the Chairman of Ideation Acquisition Corporation ("Ideation Acquisition") since its inception in 2008, while Rubin was a Director.

- Defendants Rubin and Hsiao also served on the Board of Directors of Tiger X Medical, Inc. ("Tiger X Medical") until its merger with BioCardia, Inc. ("BioCardia") in 2016, while FGIT owned 31,822,339 shares of common stock or 13.78% percent of BioCardia after the merger.[7]

- Defendant Frost was also the Chairman of Prolor Biotech Inc. ("Prolor Biotech") while Defendants Hsiao and Rubin were former directors. Prolor Biotech was bought by OPKO for $480 million in 2013.[8]

- Defendants Frost and Hsiao have also served on the Boards of Orthodontix Inc. ("Orthodontix").

- Frost, Hsiao, and Rubin also served on the Board of Modigene, Inc. ("Modigene"), Frost being Chairman, while Hsiao and Rubin were Directors, and they collectively issued a $12 million line of credit to Modigene in 2008.

- Frost, FGIT, and OPKO are also investors in Neovasc Inc., where Rubin is Chairman of the Board and Hsiao is a director.

- Frost and Rubin are also Directors of Castle Brands Inc.

- Frost and Rubin have also served on the Board of Eloxx Pharmaceuticals, Inc., where Rubin is a director.

- Frost and Rubin are past Vice Chairman and Director, respectively, of Idi, Inc.

- Defendant Rubin is a ChromaDex director, while Defendant Frost owns 6.1% thereof.

- Frost and Hsiao were also members of the Board of Fabrus, LLC, in which OPKO, Frost's FGIT, and Hsiao's HGI were major investors.

---

[6] SafeStich Medical was founded in 2005 by Frost, Hsiao, and Dr. Charles Filipi. SafeStich Medical's principal executive offices were at the Frost Office Building, according to its Form 10-K for the fiscal year ended December 31, 2007.

[7] Tiger X Medical's (now BioCardia) offices are in the Frost Office Building.

[8] Prolor's offices were in the Frost Office Building.

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT 41

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

- Frost and Rubin were also directors of Senesco Technologies, Inc., which was bought by Fabrus in 2014 and changed its name to Sevion Therapeutics, Inc.

- Frost, Rubin, and Brauser also served together on the board of Cogint, Inc. ("Cogint"), where Defendant Brauser was Chairman and Frost was Vice Chairman.

104.    Finally, demand would be futile because publicly traded companies, such as Cocrystal, typically carry director and officer liability insurance from which Cocrystal could potentially recover some or all of its losses.  However, such insurance typically contains an "insured vs. insured" disclaimer that would foreclose a recovery therefrom in the event that the Company sues to recover its damages from the Cocrystal Defendants.  As such, demand is futile.

## COUNT I

## (VIOLATIONS OF SECTION 14(A) OF THE EXCHANGE ACT AGAINST THE DIRECTOR DEFENDANTS)

105.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

106.    The Director Defendants issued, caused to be issued, and participated in the issuance of materially false and misleading written statements and material omissions to shareholders that were contained in the Company's 2018 Proxy Statement.  The 2018 Proxy Statement soliciting materials failed to disclose to the Company's shareholders the information alleged herein.  By reason of the conduct alleged herein, the Director Defendants, who caused the issuance of the 2018 Proxy Statement, violated Section 14(a) of the Exchange Act.  As a direct and proximate result of these Defendants' wrongful conduct, the Company misled and/or deceived its shareholders by falsely portraying the financial results and operations of the Company.

107.    Plaintiff, on behalf of the Company, thereby seeks declaratory and injunctive relief in connection with the misleading and incomplete proxy materials.  With respect to the "Say on Pay" compensation proposal contained in the 2018  Proxy Statement, which was approved by

shareholders due to the false and misleading statements contained in the Proxies, Plaintiff seeks: (a) a declaration that the Proxies were false and misleading; (b) an order setting aside the shareholder approval of the Say on Pay proposals; (c) an injunction barring the Director Defendants who received compensation identified in the Proxies from exercising any options or selling any stock component of such compensation pending final adjudication of these claims; (d) an injunction ordering Cocrystal to prepare a new Proxy Statement which discloses all material facts and are not false and misleading, and then submitting the Say on Pay proposal for shareholder reconsideration and voting; and (e) an injunction ordering the Company's Compensation Committee to consider the shareholders' votes on such a proposal into their compensation decisions.  The 2018 Proxy states that the Compensation Committee considers all factors it deems relevant at the time of such grants, including the Company's performance during the most recent fiscal year.  This action was timely commenced within three years of the date of the 2018 Proxy Statement and within one year from the time that Plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based.

108.    This cause of action seeks only declaratory and injunctive relief, not damages.

## COUNT II

### (BREACH OF FIDUCIARY DUTIES)

109.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

110.    Each Defendant owed Cocrystal and its shareholders the highest duties of loyalty, honesty, candor and care in conducting their affairs.

111.    At a minimum, to discharge these duties, each Defendant should have exercised reasonable and prudent supervision over the governance, management, policies, practices, controls, procedures and financial affairs of the Company and to make sure that their own interests were

subservient to those of the Company.  When significant wrongdoing arises, such as that occurred here, the Board is required to initiate disciplinary action, which may include:  "verbal warning, written warning, suspension with or without pay, or termination of employment… Cocrystal recognizes that there are certain types of employee problems that are serious enough to justify either a suspension, or, in extreme situations, termination of employment[.]"

112.    The Defendants also each owed a duty to ensure that at all times (i) corporate actions were taken in furtherance of the Company's interests and not the personal interests of its directors and/or officers; (ii) the Company's financial information was honestly reported; (iii) disclosures were complete and accurate and did not omit material information necessary to make the disclosures complete and accurate; (iv) proper accounting practices were in place; and (v) public statements made by the Company were not false and misleading.

113.    The Defendants should be required to remunerate Cocrystal for its damages and disgorge any and all gains unjustly obtained at the expense of Cocrystal and its shareholders as a result of Defendants' breaches of their fiduciary duties.

114.    Accordingly, Plaintiff seeks on behalf of Cocrystal monetary damages, injunctive remedies, and other forms of equitable relief.

## <u>COUNT III</u>

### (WASTE OF CORPORATE ASSETS)

115.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

116.    The Cocrystal Defendants breached their fiduciary duties and, thereby, caused the Company to waste its assets, operate with a material weakness in its internal controls, and impair its reputation and credibility for no legitimate business purpose, as a result of which Cocrystal has been and continues to be substantially damaged.

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT 44

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

117.    Cocrystal has been irreparably damaged by the foregoing misconduct, requiring it to expend material sums responding to and defending itself in the course of securities lawsuits, including an action brought by the SEC, which could result in material financial harm to the Company for its misconduct.  Further, the public's trust in the integrity and credibility of Cocrystal has been irreparably damaged by the scheme described herein.  Had the Company's directors acted in a timely manner and made decisions in furtherance of the Company's interests rather than their own personal interests, and implemented and maintained an effective system of internal controls, these damages could have been prevented, or at least minimized

118.    The Cocrystal Defendants have bestowed upon themselves grossly excessive compensation that has no reasonable or legitimate basis, especially due to their violations of the federal securities laws, breaches of fiduciary duties, improper and unlawful control and supervision over the Company, management, policies, practices, controls and financial affairs, which has caused substantial damage to the Company and its shareholders.

## COUNT IV

### (AGAINST THE HONIG GROUP)

119.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

120.    Each member of the Honig Group owed fiduciary duties to Cocrystal as a controlling shareholder of the Company and was required to act in the best interests of the minority shareholders and not to exert control to seek an advantage for him- or herself to the detriment of the Company and minority shareholders.

121.    Plaintiff was a minority shareholder of the Company at all relevant times herein.

122.    The Honig Group owned a substantial proportion of the voting stock of the Company and, thereby, controlled the Company.

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT 45

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

123.    The Honig Group members breached their duties by improperly exercising their control and employing a "pump and dump" scheme that benefited solely themselves and entities that either were controlled or were affiliated with them.

124.    The Honig Group engaged in related party transactions that solely benefitted the themselves and entities that were either controlled or were affiliated with them.

125.    Defendants Keller, Honig, Brauser, and Stetson were each, and collectively, controlling shareholders of the Company and, as such, each owed fiduciary duties to Cocrystal.

126.    The "pump and dump" scheme: (1) was fundamentally unfair to Plaintiff and minority shareholders; (2) disproportionately benefited the Honig Group to the detriment of the minority shareholders; and (3) had no legitimate business reason other than to transfer equity value of the minority shareholders to the Honig Group.

127.    Having breached their fiduciary duties by causing Cocrystal to approve and complete the related party transactions and their perpetuation of a "pump and dump" scheme, the Honig Group then further breached their fiduciary duty to disclose all material facts concerning transactions in which they had a financial interest.

128.    In contemplating, planning, and/or effecting the related party transactions and the "pump and dump" scheme, the Honig Group did not act in good faith toward Cocrystal and its shareholders and breached their fiduciary duties to Cocrystal and its shareholders.

## COUNT V

### (CONTRIBUTION AND INDEMNIFICATION)

129.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

130.    As alleged herein, the Cocrystal Defendants, acting as officers and/or directors of the Company and, therefore, as its agents, breached their fiduciary, common law and civil law duties to

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT 46

**BRESKIN** | **JOHNSON** | **TOWNSEND** PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

Cocrystal and its shareholders.

131.    Cocrystal's lack of internals control and the material risk it is exposed to stem in whole or in part, from the knowing, reckless, disloyal, and/or bad faith acts or omissions of the Cocrystal Defendants.

132.    Cocrystal has suffered significant and substantial injury as a direct result of the Cocrystal Defendants' breaches of their fiduciary, common law and civil law duties as alleged herein.  Plaintiff, on behalf of the Company, seeks relief from the Cocrystal Defendants on the theory of contribution and indemnity to the extent that Cocrystal is found liable for the Defendants' violations of their fiduciary duties.

## COUNT VI

**(DERIVATIVELY AGAINST ALL DEFENDANTS FOR AIDING AND ABETTING)**

133.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

134.    Each of the Defendants (other than nominal defendant Cocrystal) acted and is acting with knowledge of or with disregard to the fact that the Defendants are in breach of their fiduciary duties to Cocrystal and have participated in a conspiracy in breach of fiduciary duties.

135.    In committing the wrongful acts alleged herein, each of the Defendants have pursued, or joined in the pursuit of, a common course of conduct.  They have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to pursuing the wrongful conduct that gives rise to their primary liability, the Defendants also aided and abetted, and/or assisted, each other in breaching their respective duties.

136.    The Defendants collectively and individually initiated a course of conduct that was designed to and did violate the federal securities laws, authorize corporate actions to serve their own personal interests rather than the interests of the Company and its shareholders, misrepresent

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT 47

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

material facts about the Company, its financial condition and business prospects, prevent the disclosure of material information necessary to make statements complete and accurate, and failed to implement and maintain an adequate system of internal controls and corporate governance practices.

137.   The purpose and effect of the Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Defendants' violations of law, including violations of the federal securities laws and breaches of fiduciary duty.

138.   Each of the Defendants played a direct, necessary, and substantial part in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

139.   Each of the Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.   In taking such actions to substantially assist the commission of the wrongdoing complained of herein, the Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and were aware of their overall contributions to and furtherance of the wrongdoing.

## COUNT VII

### (DERIVATIVELY AGAINST THE COCRYSTAL DEFENDANTS FOR GROSS MISMANAGEMENT)

140.   Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

141.   The Cocrystal Defendants had a duty to Cocrystal and its shareholders to prudently supervise, manage and control the operations, business and internal controls of Cocrystal.

142.   The Cocrystal Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the business of Cocrystal in a manner consistent with the duties imposed upon them by

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

law.  By committing the misconduct alleged herein, the Cocrystal Defendants breached their duties of good faith, due care, loyalty, diligence and candor in the management and administration of Cocrystal's affairs and in the use and preservation of Company assets.

143.   During the course of the discharge of their duties, the Cocrystal Defendants knew or disregarded the unreasonable risks and losses associated with their misconduct, yet they breach their duties to the Company.  As a result, the Cocrystal Defendants grossly mismanaged the Company.

144.   Plaintiff has no adequate remedy at law.

**WHEREFORE**, Plaintiff prays for judgment as follows:

A.   Declaring that the Plaintiff may maintain this action derivatively on behalf of Cocrystal and that Plaintiff is an adequate representative;

B.   Declaring that the Defendants have breached their fiduciary duties to Cocrystal, and/or aided and abetted the breach of their fiduciary duties as alleged herein;

C.   Awarding money damages against all Defendants, jointly and severally, for the losses and damages suffered as a result of the acts and transactions complained of herein.

D.   Directing Defendants, jointly and severally, to account for all losses and/or damages sustained by Cocrystal by reason of the acts and omissions complained of herein;

E.   Requiring the Defendants to remit to Cocrystal all of their salaries and other compensation received for the periods when they breached their duties;

F.   Requiring Defendants to remit to Cocrystal all of their salaries and other compensation received for the periods when they breached their duties;

G.   Ordering equitable and/or injunctive relief as permitted by law, equity, and statutory provisions sued hereunder;

H.   Awarding pre-judgment and post-judgment interest as allowed by law;

I.   Awarding Plaintiff's attorneys' fees, expert fees, consultant fees, and other costs and

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT 49

expenses; and

      J.     Granting such other and further relief as this Court may deem just and proper.

**JURY TRIAL DEMAND**

     Plaintiff hereby demands a trial by jury.

DATED:  November 1, 2019

                                    BRESKIN JOHNSON TOWNSEND, PLLC

                              By: *s/ Roger M. Townsend*
                                    Roger M. Townsend, WSBA #25525
                                    1000 Second Avenue, Suite 3670
                                    Seattle, WA 98104
                                    Telephone: (206) 652-8660
                                    Facsimile:  (206) 652-8290
                                    rtownsend@bjtlegal.com

                                    WEISSLAW LLP
                                    David C. Katz*
                                    Mark D. Smilow*
                                    1500 Broadway, Suite 1600
                                    New York, New York  10036
                                    Telephone:  (212) 682-3025
                                    Facsimile:  (212) 682-3010
                                    dkatz@weisslawllp.com
                                    msmilow@weisslawllp.com
                                    *Admission *pro hac vice* to be sought

                                    *Attorneys for Plaintiff*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

[DOCUMENT TITLE]